1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8              FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10   TOU VANG XIONG,                          No.  1:19-cv-00569-DAD-SKO (HC)

11                        Petitioner,         **FINDINGS AND RECOMMENDATION
                                              TO DENY PETITION FOR WRIT OF**
12        v.                                  **HABEAS CORPUS**

13   S. HATTON, Warden,                       **[THIRTY DAY OBJECTION DEADLINE]**

14                        Respondent.

15

16            Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

17   pursuant to 28 U.S.C. § 2254.  He is currently serving a sentence of 112 years-to-life for his

18   conviction of two counts of second degree murder and one count of attempted murder.  He has

19   filed the instant habeas action challenging the conviction. As discussed below, the Court finds the

20   claims to be without merit and recommends the petition be **DENIED.**

21   **I.       PROCEDURAL HISTORY**

22            On February 7, 2014, in Stanislaus County Superior Court, a jury found Petitioner guilty

23   of two counts of first degree murder (Cal. Penal Code § 187), one count of attempted murder

24   (Cal. Penal Code §§ 664, 187(a)), one count of assault with a deadly weapon (Cal. Penal Code

25   §245(a)(1)), and attendant firearm enhancements (Cal. Penal Code §§ 12022.53(d); 12022.5(a)).

26   (Doc. 20-3 at 2-6.[1]) On June 30, 2014, Petitioner was sentenced to a combined indeterminate term

27

28   _____
     [1] Docket citations are to ECF pagination.

                                                 1

1   of 132 years to life plus a determinate term of 7 years in state prison. (Doc. 20-3 at 80.)

2       Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth

3   DCA").  On July 20, 2016, the Fifth DCA reversed the convictions for first degree murder and

4   premeditated attempted murder and remanded the matter back to the superior court for retrial or

5   resentencing. (Doc. 21-10 at 79-80.)  In all other respects, the judgment was affirmed. (Doc. 21-

6   10 at 79.)  On remand, the superior court resentenced Petitioner to a term of 112 years to life.

7   (Doc. 21-11.) Petitioner then filed a petition for review in the California Supreme Court.  (Doc.

8   21-12.) The petition was denied on October 19, 2016. (Doc. 21-13.)

9       Petitioner also sought collateral relief in the state courts. On December 11, 2017,

10  Petitioner filed a petition for writ of habeas corpus in the Stanislaus County Superior Court. (Doc.

11  21-14.) The superior court denied the petition in a reasoned decision on April 26, 2018. (Doc. 21-

12  17.) Petitioner then filed a habeas petition in the Fifth DCA on June 21, 2018. (Doc. 21-18.) The

13  petition was denied on September 15, 2018. (Doc. 21-19.) He then filed a habeas petition in the

14  California Supreme Court. (Doc. 21-20.) The petition was summarily denied on March 20, 2019.

15  (Doc. 21-21.)

16      On April 26, 2019, Petitioner filed a petition for writ of habeas corpus in the Sacramento

17  Division of this Court. (Doc. 1.) On May 2, 2019, the matter was transferred to the Fresno

18  Division. (Doc. 6.) On August 7, 2019, Respondent filed an answer to the petition. (Doc. 19.) On

19  October 3, 2019, Petitioner filed a traverse. (Doc. 27.)

20  **II.    FACTUAL BACKGROUND**

21      The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision[2]:

22                                  **I**

23                          **Prosecution Evidence**

24                          *The Charged Offenses*

25  As of July 20, 2009, Xay Yang resided in the 1700 block of Radley Place, Modesto.
    [Fn.2] Xay, who is Hmong, explained there are approximately eight last names in
26

27  _____
    [2] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1).
    Therefore, the Court will adopt the Fifth DCA's summary of the facts.   Moses v. Payne, 555 F.3d 742, 746 (9th Cir.
28  2009).

                                   2

the Hmong culture. If two people share the same last name, they are automatically part of the same clan. It is considered taboo to date or marry someone from the same clan, even though blood ties, if any, may be very distant. Clan members refer to each other as cousins or, in the case of someone older, grandparent or aunt or uncle, even if they are not blood relations.

> [Fn.2] To avoid confusion, we refer to the Yangs and certain other individuals by their first names. No disrespect is intended. We also refer to the scene of the shooting, which was the address at which Xay lived, as dwelling A, and to the house directly across the street as dwelling B. Undesignated references to dates in the statement of facts are to the year 2009.

Nhia Yang was Xay's brother. As of July 20, he was living in a detached room behind dwelling A. The room had two doors and a small window, as well as electricity, but no kitchen or bathroom.

Xyeem Yang had known defendant for two months as of July 20. They were "[b]uddies." They lived together in Winton, along with Xyeem's "uncle," Bee Yang, Bee's son, and Gao Yang. [Fn.3] Gao and defendant had been going out as long as Xyeem had known defendant.

> [Fn.3] Bee was not really Xyeem's uncle, but Xyeem referred to him as such as a sign of respect. Xyeem had known Nhia most of his life, but was not sure if there was a close family relationship.

Lee Pao Yang lived in the same residential complex as defendant, and they became friends. As of July 20, they had known each other since Lee got out of jail, following a receiving stolen property conviction, in June. Gao, Lee's distant cousin, introduced them. Lee had known Nhia two or three weeks. Defendant introduced them. During the time they knew each other, Lee and defendant smoked crystal methamphetamine together approximately twice a day almost every day. Defendant furnished the drugs. Lee did not know where he got them, although he personally saw defendant sell drugs.

Around 5:00 or 6:00 Saturday evening, July 18, Xyeem, defendant, Gao, and Lee went to a party in Modesto. Lee did not want to go and said he had to attend an uncle's funeral in Sacramento, but defendant pointed a gun at him and said if Lee did not go with him, defendant was going to take Lee's "whole family to a different place." Defendant took what Xyeem believed to be an AR-15 firearm in the car with them. He said it was for protection, but did not say protection from what. [Fn.4] Xyeem did not remember what happened from the time of the party into the next day, because he was drinking. He did see Gao and defendant arguing for a little bit; however, this was typical of their relationship. Xyeem saw them arguing every day about their relationship. Both would yell and accuse the other of cheating. Then they would make up.

> [Fn.4] In the past, Xyeem had seen defendant with a .357 revolver and a .380 pistol in addition to the AR-15. According to Lee, defendant wrapped the AR–15 in a white towel and put it in the trunk just before they left for Modesto.

The group stayed at the party until early Sunday morning, July 19. They then went to Nhia's home, the detached room behind dwelling A. They all smoked methamphetamine, including Nhia, who had also been at the party. [Fn.5] At some

point (Lee believed around 3:00 or 4:00 a.m.), everyone fell asleep. Xyeem was in the main house. Lee slept on the couch in Nhia's room. Nhia slept on one bed. Defendant and Gao slept on the other bed.

> [Fn.5] Lee originally denied doing drugs to police because he was on probation. The five of them (Lee, Nhia, Xyeem, Gao, and defendant) smoked methamphetamine furnished by defendant on multiple occasions over the course of the weekend, although most of the times, Xyeem and Lee did not join in.

Sunday morning, everyone woke and started going about their day. According to Lee, they all did drugs and then ate breakfast in the kitchen of the main house. According to Xyeem, defendant said something about people wanting to do "voodoo things" to him. Defendant, Gao, and Xyeem went out to buy food and go to the Buddhist temple. [Fn.6] It was defendant's idea to go to the temple. He wanted to be blessed. He said he thought there was a bad spirit in him and he wanted to get rid of it. After they left the temple, they bought some groceries, then went home and cooked.

> [Fn.6] Nhia and Lee stayed home. Lee did not call the police at this time to report defendant had threatened his family, because he was afraid defendant would return, learn he had called from Nhia, who was defendant's best friend, and do something to Lee's family or shoot him.

Lee estimated defendant and Gao were gone until night, perhaps six or seven hours. Just before defendant, Gao, and Xyeem left, Lee saw defendant bring the AR–15 into Nhia's room. It was still wrapped in the towel.

Xyeem recalled that he, defendant, and Gao returned to Nhia's room and smoked some methamphetamine. At some point, Gao cooked, and they ate in the living room of the main house. They then returned to Nhia's room. This was Sunday night, July 19. Around 10:00 p.m. or midnight, defendant, Gao, and Nhia went to Walmart to get some clothes. After they returned, defendant and Gao argued about being possessed and cheating on each other. At some point, defendant pulled out a revolver, unloaded it except for one bullet, spun the cylinder, pointed it at Gao, and pulled the trigger. Defendant was smiling when he did it. Xyeem had seen defendant do the same thing two or three times when arguing with Gao. Because Gao and defendant were getting violent, Xyeem put the AR–15 between Nhia and the bed. He also told defendant to "be cool." Defendant "chill [ed] out" after that. The five of them - defendant, Gao, Xyeem, Nhia, and Lee - then smoked methamphetamine "a couple times." About two hours later, around midnight or 1:00 a.m., Xyeem went to the front bedroom in the main house to sleep.

Lee recalled that defendant, Gao, and Xyeem returned around 8:00 or 9:00 p.m. Defendant brought some food and crystal methamphetamine into Nhia's room. Nhia cooked the food, and they all ate in that room. They all smoked some of the methamphetamine. Lee estimated the five of them had around four puffs each. After that, they just sat around and talked. This was around midnight. Lee was lying on the couch, texting his girlfriend on defendant's phone. [Fn.7] He was not paying attention to anything going on in the room.

> [Fn.7] Lee did not have a phone of his own. Defendant loaned him his. Everyone went to bed between 1:00 a.m. and 2:00 a.m., with Lee, Nhia, defendant, and Gao bedding down in Nhia's room. As on the night before, defendant and Gao were on one bed, Nhia was on the other bed on the other

4

side of the room, and Lee was on the couch. Xyeem was in the front house.

Sometime after everyone went to bed, Lee, who was still texting his girlfriend, heard defendant and Gao moving and whispering as they tried to have sex. Gao did not want to have sex while Lee and Nhia were in the room, and she and defendant started arguing. It was commonplace for them to argue; Lee estimated they argued about twice a week, and he basically ignored it. [Fn.8] This night, the argument went on and on. Lee tried to sleep, but had to use the bathroom and so he got up around 4:30 to 5:00 a.m. and entered the front house through the French door in the back. The lights were off in Nhia's room. Defendant and Gao had been loudly arguing for an hour or two. At no time that evening had Lee seen defendant pull a gun on Gao. At the time Lee left the room, the rifle was between defendant's and Nhia's beds.

> [Fn.8] Lee testified at the preliminary hearing that the relationship between the two was fine, and they argued once in a while, mostly over money and drugs.

Because he did not feel comfortable listening to Gao and defendant argue, Lee remained in the bathroom a good 15 to 20 minutes. When he returned, the lights were on in Nhia's room. Defendant and Gao were still yelling at each other. Nhia had gotten out of bed and was sitting on a chair. Gao was sitting on the bed. Defendant was holding the rifle. He was the only person in the room holding a weapon.

Gao and defendant argued for another five minutes or so, then defendant fired five shots into the ceiling by Nhia's bed. He was very angry. Everyone fell silent and looked at him. He then pointed the AR-15 directly at Gao, who put her hands up to try to protect her face, and fired three times without saying anything. The bullets struck Gao in the face, and she fell on the bed. Defendant then started to swing the gun at Lee, who was standing in the doorway, and Lee crouched and ran as gunfire came his way.

Lee ran around the house, then stopped to check if he had been hit. He realized he had been shot because blood was coming from his mouth. [Fn.9] He heard defendant say, "This is what you get, Nhia." Defendant sounded angry. Lee heard a couple of gunshots a couple seconds after defendant spoke, and he took off running again. He ran for several blocks, because he was scared of defendant chasing after him and killing him. He called 911 on defendant's phone.

> [Fn.9] Lee was struck on the chin and both arms. He ultimately was hospitalized for two weeks as a result, and had to have surgery to have his chin reconstructed and his teeth repaired. Afterward, his jaw was wired shut for six months.

On the night of July 19 and into the early morning of July 20, Xay, who was a fulltime student and also worked, was finishing up her homework in her room, which was adjacent to the walkway separating Nhia's room from the main house. She was completely sober.

Xay went to bed around 2:00 a.m. on Monday, July 20. She subsequently was awakened by a few loud pops that seemed to come from the direction of Nhia's room. She looked at the clock; it was 5:20 a.m. She heard Nhia say something like, "Hey, man," or "Eh, man." He seemed surprised and confused. His voice came from inside his room. Xay then heard three or four more shots.

5

Not realizing at the time she was hearing gunshots, Xay ran toward the French door, which was the only exit directly into the backyard, to see what was going on. She saw defendant standing on the walkway a couple of feet from the French door and four or five feet from the east entrance to Nhia's room. Defendant was holding a rifle and a handgun. He was pointing the rifle toward the east door of Nhia's room. He appeared cautious, as if he was still waiting for someone. He did not ask Xay for help or to call an ambulance. He told her, "You guys set these tigers on me," and that there were tigers everywhere. [Fn.10] She thought he meant actual people that were related to her, i.e., members of the Yang clan, as opposed to an animal with claws, because Hmongs usually used "tiger" to refer to someone the person disliked. "Tiger" was a common insult. [Fn.11] It could, however, refer to a supernatural being that was a menacing creature. At some point, defendant told Xay he was a shaman and was capable of seeing "these things." [Fn.12] Other than using the word "tiger," defendant seemed oriented to time and place. Xay believed defendant to be referring to people.

> [Fn.10] Xay also reported defendant said, "You guys set these monsters on me."

> [Fn.11] Xay explained that animals play a significant role in Hmong culture. Certain animals, like tigers, carry a negative connotation.

> [Fn.12] Xay explained the Hmong people's cultural beliefs include a deep-rooted belief in the spiritual world. The Hmong perform rituals on a yearly basis to keep their spiritual being well. They also have shamans who are capable of communicating with the dead, and who do what is necessary to repair the living spiritual being. The spirits choose who will be a shaman, and while there are quite a few shamans in the Hmong population in Stanislaus County, it is common for people to claim to be shamans when they are not. In the Hmong culture, there is no designated place to go to worship, although Xay knew of Laos Temple in Ceres. If a person needs prayer or blessings, he or she goes to a shaman. Likewise, if a person feels he or she has an evil spirit inside, which is relatively common, he or she normally visits a shaman.

Defendant also demanded several times that Xay call his father. Xay truthfully told him the house phone could not make long-distance calls. She had a cell phone in her hand, but hid it from defendant because she did not want him to escape.

Defendant had Xay open the French door all the way so he could see inside. He pointed the handgun directly at her forehead from an inch or two away and told her to come outside. He told her "he had killed the two tigers, he killed them there," and he pointed to Nhia's room. He wanted her to take him home, and said if she did not help him, she would see what would happen. He pointed her to the room where the bodies were and forced her to go and look at them.

Xay went to the door of Nhia's room. Defendant kept the gun pointed at her the whole time. She looked inside and saw Nhia on the couch. He appeared to be dead. Defendant said there was a second body, but Xay did not see anyone else, as she could not see the whole room from just outside the door. Defendant asked Xay if she was scared. She told him yes. He seemed very proud of and boastful about what he had done.

Xay walked back toward the French door, while defendant backed up toward the fence. He made Xay swear she would help him. He made her raise her hand and

swear upon the next generations and on the name of her recently deceased father, so that if she did not help him, she would be cursed. Defendant said if Xay did not help him, the next thousands of generations of Yangs would be cursed. [Fn.13]

> [Fn.13] Xay explained curses are common in the Hmong culture. If someone does something wrong or does not live up to an agreement, the wronged person can put a curse on the wrongdoer. Swearing oaths and cursing are taken very seriously.

Defendant said Xay had to drive him home, because then his family could help him. She said she could not do that without her purse and key, which were in her room. Defendant kept insisting that she take him home. He seemed in a hurry to get out of there, but refused to exit through the front door or the back gate. He then told her to address the tiger that had gotten away. Xay did not see anyone else around.

Xay kept telling defendant that he had to let her get her purse and key, which were in her room, or there was no way she could help him. He finally relented, then told her to open the front door so he could run through the house. Xay obeyed, then defendant told her to come back toward him and stay in the middle of the living room. He still had the gun pointed at her. He then quickly ran through the house and stopped by the passenger side of Xay's vehicle. Xay made it appear she was going toward her room, then ran to the front door and closed and locked it.

During the entire incident, which lasted about five minutes, Xay never saw anyone but defendant. He never described to her seeing something that was not really there.

As of July 20, Daniel Garza lived next door to dwelling B. Early that morning, he heard "a whole bunch" of gunshots coming from dwelling A. Looking out his front window, he saw a man holding some kind of rifle and a reddish blanket exit the front door of dwelling A. The person, whom Garza pointed out to the police when they arrived, went right across the street to dwelling B. He appeared to be walking normally. He stood in the front yard of dwelling B some eight to 10 minutes, until the police arrived. At one point, Garza heard him loudly say, "Open the door." When the police arrived, Garza heard the person say to them, "Kill me. Kill me," or "Shoot me. Shoot me."

The police received a call about the shooting at 5:25 a.m., from a neighbor who reported hearing four to five shots fired. In addition, Lee called 911. He reported he had been shot in the mouth and the arm, and he was hiding in the backyard of an abandoned house because defendant, whom he named (by nickname) as the shooter, was coming. Lee reported there were two other shooting victims still at the house, but he had run away and was bleeding to death. Lee said defendant had three guns.

Multiple officers from the Modesto Police Department and deputies from the Stanislaus County Sheriff's Department responded to dwelling A. Officer Murphy was the first on scene, arriving at 5:32 a.m. Upon his arrival, he saw defendant, who matched the description of the suspect, standing in front of dwelling B. Defendant "frantically" told Murphy that his cousins had tried to kill him. When Murphy asked where they were, defendant pointed to dwelling A.

Officer Wesley arrived a short time later to find Murphy giving commands to defendant. Defendant, who was standing in the front yard of dwelling B, a few feet from the garage, was wearing nothing but boxer shorts. He was not holding any weapons. He came out to the officers as ordered and was placed in handcuffs. He seemed fairly calm, considering the circumstances.

7

Defendant was placed in the back of a patrol vehicle. Wesley sought to identify him, and defendant gave his name and date of birth. Defendant's answers were responsive to each question Wesley asked, and he appeared to be oriented to his current location. However, he told Wesley, "Officer, they tried to fucking kill me," followed immediately by something about black magic. He appeared nervous and agitated, although he was cooperative. All told, Wesley spent about a minute and a half with defendant. Wesley, who had received training in determining whether someone was under the influence, did not perform such an evaluation on defendant, and observed nothing to suggest defendant was impaired by methamphetamine.

Meanwhile, Officer Kroutil joined the search team that entered dwelling B based on information the suspect had fled to that address and possibly headed into the backyard. In clearing the garage, Kroutil discovered a Colt Sporter rifle, the civilian version of an M16, partially wrapped in a red towel under the minivan. The rifle had a 30-round magazine, meaning the weapon could carry 31 rounds if fully loaded. The weapon was empty. A red substance that appeared to be blood was on the barrel and fore end of the gun. A loaded Ruger revolver, from which two shots had been fired, was found in vegetation next to the door of the garage.

Kroutil then went back across the street to dwelling A. Inside the structure behind the house were a deceased male -- Nhia -- and female -- Gao -- both of whom had what appeared to be bullet holes and gross trauma from being shot at close range. There were shell casings and a live round on the floor. There were a lot of bullet holes in the walls, and some in the ceiling. Multiple baggies of methamphetamine were found throughout the structure. Also found was a glass pipe used for smoking methamphetamine. [Fn.14] A blood trail exited the structure and led to Lee, who was found several blocks away.

> [Fn.14] Two days after the shooting, a gun was found between the mattresses of one of the beds in the room. It had after-market grips on it. A search of defendant's home in Winton turned up a photograph of defendant with a weapon in his waistband that appeared identical to the one recovered from the bed. Another photograph seized in the same search showed defendant with his arm around Gao's neck. In his hand was a Ruger revolver that was consistent with the Ruger recovered the morning of the shooting. Defendant appeared to be pointing the gun at the photographer.

Nhia's autopsy revealed he had nine high-velocity-type gunshot wounds to the body, two of which entered from the back. [Fn.15] The range of fire for most of them was intermediate (meaning, assuming the weapon used was a rifle, the tip of the barrel was within two to three feet), although one of them, which was to the head and caused massive destruction of the skull and brain, was within inches. Nhia also had three blunt force injuries to the face that had a circular pattern consistent with a stabbing motion of a barrel of a rifle. There were signs the same type of injury occurred to the eye, which was collapsed but without signs of circular cuts. Two fairly intact projectiles were recovered during the autopsy. One, which was recovered from one of the shots to the back, came from the Ruger found in the vegetation outside the garage of dwelling B.

> [Fn.15] An AR-15 or M16, which are similar, would be considered high-velocity weapons.

The cause of death was multiple gunshot wounds. Most of the damage was to Nhia's head and upper abdomen, and most of the wounds were potentially fatal. Although the sequence of wounds could only be generalized, given the distance, it was

probable the wounds to the torso were received first, then the one to the head was probably the last shot. Death would have occurred within seconds of that shot.

Gao's autopsy revealed five high-velocity-type gunshot wounds, two of which entered from the back. At least one, which hit the hand and then caused massive destruction to the flesh of the face and exited the throat, was a lethal wound. The cause of death was multiple gunshot wounds. Death could have occurred in minutes to an hour or slightly more.

Blood was drawn during each autopsy. Nhia's blood contained methamphetamine in a concentration of 1,180 nanograms per milliliter. Gao's blood contained methamphetamine in a concentration of 2,660 nanograms per milliliter. Dr. Carpenter, who performed the autopsies, explained that postmortem blood levels are "notorious for being inaccurate as to what the level was just prior to death," because the levels obtained from toxicology tests vary depending on the location from which the blood was drawn.

Blood was drawn from defendant at 10:27 a.m., approximately five hours after the shooting. [Fn.16] It contained methamphetamine in a concentration of 150 nanograms per milliliter. Daniel Coleman, a criminalist supervisor with the Department of Justice toxicology laboratory who analyzed defendant's blood, explained that if a person takes a drug over a long period of time, his or her tolerance increases and it takes more of the drug to produce the same effect. Coleman had run thousands of blood tests to quantify the presence of methamphetamine. The highest level he had seen in someone still alive was around 2,000 nanograms per milliliter. The typical range for a person who would be considered under the influence for purposes of a violation of Health and Safety Code section 11550 would be 300 to 700 nanograms per milliliter, although it could be lower or higher for some individuals. A concentration of 10 to 50 nanograms per milliliter would be the therapeutic level, meaning the level at which the drug would be prescribed; 600 to 5,000 nanograms per milliliter would be the toxic level, meaning there would be negative effects; and a concentration of greater than 10,000 nanograms per milliliter would be fatal.

> [Fn.16] Detective House of the Modesto Police Department was the lead investigator for this case. He transported defendant to the hospital to have blood drawn. Although House did not specifically evaluate defendant for being under the influence of a controlled substance, he believed, based on his training and experience, defendant might be under the influence; hence, the blood draw.

Coleman explained the concentration in defendant's blood would have been as of the time the blood was drawn. Although a number of variables affected how quickly drugs were eliminated from a person's body, the half-life of methamphetamine - the amount of time it took to reduce concentration by half - typically was six to 15 hours. There was, in essence, a "drug curve" entailing absorption, distribution, metabolism, and elimination of the drug, that represented the drug's concentration. Without information concerning where the person was in the process, concentration could not be extrapolated back in time to a point before the blood was drawn. If, however, a person consumed methamphetamine before being taken into custody, he or she was taken into custody no later than 5:33 a.m., his or her blood was drawn at 10:27 a.m., and the person's concentration was 150 nanograms per milliliter, Coleman would expect that person's concentration to be higher at 5:33 a.m. than at 10:27 a.m. How much higher would depend on a number of variables. In Coleman's opinion, it would likely be less than 300 nanograms per milliliter at 5:30 a.m. Although the

9

person's concentration could have been 2,000 nanograms per milliliter or even higher at some point, it would have been earlier than 5:30 a.m. The higher the peak concentration, the longer it would take to get down.

Carpenter placed Gao's and Nhia's methamphetamine concentrations in the toxic range, which potentially could start as low as 200 nanograms per milliliter. When people have methamphetamine levels in the toxic range, they can have "disturbing" side effects. These can include insomnia, excessive nervousness, loss of appetite, inability to control anger, and anything associated with hyperstimulation. The stimulation is called "fight or flight"; the body becomes very vigilant, and in fact more vigilant than desired. At extremely high levels, hallucination can be a side effect of methamphetamine ingestion. Methamphetamine is not normally a hallucinogenic, however. [Fn.17] Where methamphetamine is concerned, tolerance plays a role. If a person is a heavy methamphetamine user, his or her tolerance will be higher so it takes more of the substance to cause the same effect. Someone taking methamphetamine for the first time would be affected by side effects at a lower level than a continuous user of the drug. Methamphetamine in a concentration of under 200 nanograms per milliliter would be considered in the therapeutic range and was probably not a level likely to cause unwanted side effects. For a hallucinogenic side effect, the level would likely have to be high in the toxic range, although this would depend on the individual. Carpenter explained an individual's behavior cannot be predicted simply from his or her blood level because his or her tolerance is not known. He would not expect someone who used methamphetamine daily and whose level was 150 nanograms per milliliter to have side effects.

> [Fn.17] Carpenter explained that "hallucinogenic" means the person develops loss of orientation to person, place, time, and situation; and may suffer delusions and visual and/or auditory hallucinations. It is a drug-induced psychosis that can occur on rare occasions in certain individuals with high levels.

House interviewed defendant beginning shortly after 1:00 that afternoon. [Fn.18] Defendant was mostly calm, although he became angry on occasion. He was responsive for the most part, although sometimes he was evasive. House found him calculating and able to reason. He appeared to be oriented to time, place, and situation. Early in the interview, he expressed knowledge Gao had been shot. Over the course of the interview, defendant claimed he was angry about it, but did not appear to be emotionally upset, even though he said Gao was "the love of his life" and Nhia was his best friend. [Fn.19] He also said he considered Lee to be a brother.

> [Fn.18] Portions of the video recording of the interview were played for the jury.

> [Fn.19] House knew Xyeem had told another detective that on the night before the homicides, Xyeem overheard defendant asking Gao why she did not love him anymore.

House talked to defendant about Gao. Defendant said they had been dating approximately three to four months and were living together. He said he had been having some "bad vibes" from the Yang family about their dating. Defendant said he had known the Yangs since he was a young boy. He knew them from "[t]he street" and a gang he had been in. Defendant said he was a former member of the Orient LOCS, which had disbanded some time earlier.

In terms of his presence at dwelling A prior to the homicide, defendant initially said

he was forced to go there. Although he was not definitive, he mentioned Nhia, Nhia's uncle, and Lee in that regard.

Defendant told House he had had sex with Gao the night before and gone to sleep, and he had been sleeping before the shooting. House repeatedly talked to defendant about the fact there were 17 or more gunshots from an automatic weapon and a .357 in that small room. Defendant said he had not heard the shots. He said he did not know why. He did say, however, that before going to sleep the night before, he had been "[h]ella tired."

Defendant said he woke to find Gao and Nhia shot dead. He picked up the guns, which he said were an AR-14 or AR-15 and a Ruger .357 revolver, and left the room. He said the rifle belonged to a friend of his whose name he could not remember, and the .357 belonged to Nhia. Defendant never claimed ownership of the guns, and repeatedly maintained he did not hear any gunshots.

Defendant related that after he left the room, he wanted to enter the front house to wake Xyeem. He encountered Nhia's sister (whose name he did not know) at the back door of the main residence. Defendant said he was "scared to death." He said Nhia's sister asked him where he thought he was going. Defendant said he was going to his cousin's house across the street. He was unable to tell House the names of those cousins. Defendant told the cousins there were "bad people ... over there" and asked them for help.

At some point, House talked to defendant about Lee and whether he was present when defendant woke up. Defendant said Lee was not there. He knew, however, that Lee had been shot, even though, to House's knowledge nobody had told defendant this fact. Defendant said he knew prior to the shooting that this event was going to occur. Defendant said he counts backwards on his fingers and tends to know things when he does that. He also said he prayed to God not to notice "these things," but that he did see ghosts. He said he saw things and people did not believe him when he saw things.

During the course of the interview, which, as was typical of interrogations, skipped around, defendant said the .357 and rifle were the property of MOD (an Asian gang named Menace of Destruction). Defendant said Lee was a member of MOD and had brought the weapons from Winton. Defendant said Lee kept them at defendant's house in Winton. Defendant said Lee had given him the .357 because he did not want defendant to feel pressured by Lee or Nhia or two males defendant did not know, but whom he identified as Menace of Destruction. Defendant said he began to feel threatened by Nhia, Lee, and the two males, because they had the guns, and so he accepted the gun.

Defendant insisted he did not shoot or kill anyone. He related that Xyeem went inside the main house to sleep, leaving defendant, Gao, and Nhia in Nhia's house. Lee was also there, along with the two people defendant did not know. He guessed they were relatives of Nhia. Defendant said Xyeem was "dead asleep" and did not know anything. Defendant had told him a few months earlier that "bad shit[ ]" was going to happen in the back house. Defendant again denied killing anyone. He told House to ask Xyeem or Lee, as they knew the people's names. Defendant said he did not know what woke him up, but when he woke, he saw Lee lying dead. Asked by House who he thought shot her, defendant responded by asking whom House thought shot her, and saying House thought it was defendant. When House asked why defendant kept saying that when House had never said he thought defendant did it, defendant replied, "I can read right through your mind." Defendant implied

Lee and the two unknown males shot Gao and Nhia. [Fn.20]

> [Fn.20] Other than defendant's statement, House had no evidence anyone other than Lee, Gao, Xyeem, defendant, and Nhia were in the room that night.

Defendant told House that when he woke up, Lee and the two other people were not there, although he saw people running. He did not know where Lee or the other two went, but when he got to his cousin's house, the gate was not closed. [Fn.21]

> [Fn.21] Dwelling B had a driveway gate and possibly one at the side of the house.

Defendant said he took the guns to his cousin's house across the street. He did not know what made him take them over there. His cousins did not want to open the door for him and told him to put the gun down. Defendant threw the rifle under the car in the garage and the other one on the grass in the front yard outside the garage. His cousins still would not open the door, and that was when the police came.

House talked to defendant about him wanting Xay to take him home. According to defendant, he told Xay that she needed to take him home. She then swore she would take him home. She told him she had nothing to do with hurting him and had no intention of hurting him. He said if that were true, why did she not let him go to his cousin's house? She said no. She told him to put down the guns and he did. Defendant told her to call the police. She said Lee was hiding there in a bush.

At some point during the interview, House informed defendant that Lee had been shot and had identified defendant as the shooter. Defendant said this was a lie. He said Lee was a member of an opposing gang, but defendant nevertheless had taken him in, and tried to mentor him and keep him out of gangs. During this conversation, defendant referred to Lee as "a little snitch." He also said Lee had stolen some money from him, and he called Lee an "evil, mother fucker."

When House told defendant he was looking at two counts of homicide, defendant said he did not care. He also said something to the effect that those who had lied about him would be punished seven times worse. Also at some point, House mentioned that he told defendant two people were shot, and defendant seemed to think House was wrong. Defendant replied that five people were shot: Gao, Nhia, Lee, and the two people defendant did not know.

House talked to defendant about his drug use on the night before the homicide. Defendant said they had all used methamphetamine that night, and that he had taken "two hits." At first, defendant claimed someone forced him to take the drugs. Then he admitted everybody had been smoking methamphetamine that night. When House asked if those two hits could have affected defendant to the point he would not know what was going on, defendant said no, he just fell asleep. Asked if that was what crystal methamphetamine normally did to him, he again said no.

During the interview, defendant never said he was shooting at demons. When House talked to him about tigers, however, defendant said the Yangs were tigers and the Xiongs were bears. [Fn.22] Defendant said that was something that came from his culture and family tradition. In the old days, Yangs were called tigers because they would turn into tigers. He did not know why Xiongs were called bears. He said it would come back to them "seven times worser" because seven was the Yangs' favorite number. Defendant acknowledged he and the Yangs both were Hmong. He

said most of the houses had a lot of "crazy shit," like stuff hanging around doors. When House said he had been inside the house and there was a lot of cultural stuff with which he was not familiar, defendant replied: "Culture stuff is just only one simple thing. That's it. You don't have things hanging—you know what I mean? But then after—at the same time I ain't—I'm not going to go all that superstitious shit. You know what I mean? I'm just going to go about it is what it is." Asked what superstitious stuff he was talking about, defendant replied, "I'm not going to talk about no superstitious stuff because this is real life. This ain't just superstitious." House asked why, then, he was using the term "tiger" at the scene. Defendant explained it was what they called themselves and what they represented themselves as.

[Fn.22] There was a tiger on a door of Nhia's room.

At no time during the interview did defendant say he saw something that was not really there. He showed different emotions, including anger. He changed his story during the course of the interview, sometimes adding information and sometimes taking information back. He never admitted shooting anyone, and repeatedly denied doing so. He denied telling his cousins across the street that he had killed the tigers.

At the end of the interview, defendant said something in a foreign language House assumed was Hmong. House asked him what he said, but defendant would not respond. Defendant was singing religious songs when House left the room. House looked at the video recording later and observed defendant speaking when no one else was present.

### *Defendant's Preoffense Conduct*

When Lee first met defendant, Lee considered him a "nice gentleman." Lee's feelings changed two to three weeks before July 20. Lee had been in custody for burglary and receiving stolen property. He was outside his house, smoking a cigarette, when defendant came over and started smoking with him. Defendant then pulled out a revolver, pointed it at Lee's forehead from an inch or two away, and said he had found out Lee was a snitch and did not like snitches. Defendant said Lee was a snitch because Lee's friends were locked up after Lee was. Gao intervened and told defendant to stop. She vouched for Lee, whom she said was like her little brother. Defendant then told Lee not to contact anybody, and to just associate with defendant. Defendant, who was a drug dealer at that time, was concerned Lee might snitch on him. Lee was contacting his probation officer as required, and defendant thought he was contacting the police about things.

On another occasion, Lee and his cousins were playing video poker at defendant's house. Defendant was not home at the time. When defendant returned from the store and saw everyone sitting there, however, he went straight to his room and grabbed an AR-15 rifle. He then came into the living room and started pointing it at everyone. He accused them of planning to kill him or something. He blamed Lee because the others did not like him.

On yet another occasion about two to three weeks before July 20, defendant accused Lee's cousin, Na, of stealing money from him (defendant). Defendant pulled the same revolver he had pointed at Lee, and pointed it at Na's leg. Defendant pulled the trigger five times, but the gun just clicked instead of firing. [Fn.23] Defendant told Na he was lucky.

[Fn.23] Lee did not know whether it was loaded.

13

[Fn.24] This evidence was admitted during the People's rebuttal case.

On May 31, 2010, Deputy Silva was working on the third floor of the Stanislaus County Men's Jail. The third floor was the "max floor." That day, Silva was escorting inmates to and from the shower. He had the door to defendant's cell halfway open when defendant ran out of the cell, carrying a spear that was at least one to two feet long, and headed in the opposite direction from the showers. He ran to a cell several cells from where he was housed, stood in front of it, and began jabbing his spear into the cell. Inmate Jackson was in the cell at the time. Silva radioed for assistance; once another officer arrived and both officers pointed their Tasers at defendant, defendant complied with orders to drop the weapon and lie on the ground. When Silva handcuffed defendant, he discovered defendant had a sharpened toothbrush attached to his left arm with elastic from the waistband of his underwear.

On May 2, 2013, Deputy Maxwell was working on the second floor of the jail, where defendant was housed. Maxwell was "conducting showers." As he opened defendant's cell, defendant ran in the opposite direction from the shower, holding a large spear constructed of jail-made paper with a screw at the end. He ran several cells down and started repeatedly thrusting it into the cell where inmate Hunter and another inmate were housed.

On July 19, 2013, Deputy Fay was working at the jail. At approximately 2:35 p.m., Fay was escorting inmate Salgado down the jail tier called "private singles." When Fay and Salgado passed defendant's cell, defendant reached out and grabbed Salgado by the jumpsuit. Almost simultaneously, defendant's cellmate, inmate Phommahaxay, threw a spear out of the cell. Although Fay pulled Salgado away, Salgado sustained a small cut to his ear. An administrative hearing was held as a result of the incident. Defendant was found guilty of disruptive conduct and interference with staff duties and responsibilities. He was found not guilty of battery on an inmate, assault of an inmate, possession of weapons, violation of inmate rules, and violation of criminal law.

On August 28, 2013, Deputy Fittje was working on the third floor of the jail. At approximately 5:40 that morning, he and his partner on the floor were "conducting showers" on the private singles tier. When Fittje let defendant and his cellmate, inmate Phommahaxay, out of their cell to walk to the showers, they ran two cells down. Defendant was holding a jail-made spear. Defendant threw the spear through the cell bars in an attempt to assault inmate Naylor. Fittje and his partner drew their Tasers, pointed them at defendant and Phommahaxay, and ordered them back to their cell. The two complied.

## II

## **Defense Evidence**

Bai Xiong was defendant's sister. She knew Gao from the time defendant started dating her. Bai saw Gao and defendant, who were always together, every day. Bai and defendant were very close, and Gao and defendant loved each other a lot. Bai never saw them fight. A couple of weeks before the shooting, however, Bai started seeing defendant less, perhaps only three times a week. He was using "a lot" of crystal methamphetamine and separating himself from family.

A month or so before the shootings, defendant exhibited hallucinatory behavior to Bai. He started acting "really crazy" and talking about seeing people and seeing his best friend who had passed away. He was scared and always thought someone was after him. [Fn.25]

> [Fn.25] Modesto Police Detective Pouv interviewed Bai in the course of investigating the shootings. According to Pouv, Bai told him defendant did not have any issues with respect to alcohol or drug abuse or mental instability.

Defendant was once married to a woman named Farm. Their relationship initially was a happy one. On one occasion, Bai saw Farm and defendant in a verbal argument that escalated to the point that Farm chased defendant with a knife. Defendant ran from Farm. The marriage ended in divorce, which "really upset" defendant.

As of July 20, Lee Moua was living in dwelling B. That morning, he heard the window opening. He saw defendant carrying two guns. Moua and defendant talked for a little over two minutes. Defendant appeared to be "abnormal." Defendant told Moua to call defendant's father. He sounded anxious. There was a house cat close to his feet. Defendant tapped the cat away with his foot and asked Moua why he was raising tigers. Defendant did not point the gun at the cat. He did not point the gun at Moua, although he made a motion with the gun and was yelling when he was telling Moua to call his father. Defendant was not threatening, but rather "like he was abnormal."

Neng Yee Lee had been a shaman for approximately 40 years, first in Laos and then in the United States. He explained that a shaman is someone who helps "litigate" problems in the spirit world, i.e., when people get involved with the spirits. There are several types of spirits in the spirit world. There are the wild spirits that lived in the wild. There are also warrior types of spirits. If people get "tangled" with the warrior types, they will have problems and the shaman will have to deal with them. Spirits sometimes take animal forms, normally the form of tigers. Tiger spirits will make a family sick, and if the shaman does not perform certain rituals, the family could possibly die. These are not real tigers, but spirits. If someone does not have a problem, the tiger spirits will be peaceful. If someone has a problem, however, they will not be. Shamans and even some ordinary people are capable of seeing spirits. Neng Yee Lee himself had seen them in Laos. They also exist in the United States.

Mong Vang considered defendant to be one of his best friends. Vang last saw him at defendant's residence in Winton. Gao, Lee, and Xyeem were also present. They left for a party in Modesto, but Vang did not go with them. He was asked to come to the party "in a kindly way," but did not go because he had to pick up his wife from work. Vang heard a conversation between Lee and defendant. All defendant asked Lee was, "Do you want to go?" It was "a kindly conversation"; everybody was joking. Defendant did not pull a gun on Lee. Although Vang had seen defendant holding a rifle once or twice and had seen defendant with two different types of guns, he did not see any guns that night.

Dr. Alex Yufik, a board-certified forensic psychologist with a law degree whose private practice and employment consisted of assessing, evaluating, and treating substance use disorders, including methamphetamine, and who had specific training and experience with respect to methamphetamine psychosis, testified as an expert on methamphetamine-induced psychosis. He explained that methamphetamine use causes hyperalertness, tachycardia, excessive sweating, and a sense of euphoria.

15

Later, additional symptoms occur, such as loss of capacity to plan or organize behavior and paranoia.

Yufik explained that addiction is a chronic, progressive, and potentially fatal brain disease. Once a person becomes addicted, it becomes a brain disorder, and the subsequent behavior is the product of defective brain tissue. Use of methamphetamine over a period of time actually changes the user's brain, and the changes become worse with prolonged use. Methamphetamine affects brain chemistry and so causes functional impairment. It affects the portion of the brain responsible for executive functioning, i.e., planning, judgment, and organization. [Fn.26] In some cases, the user starts to develop psychotic symptoms, meaning he or she loses touch with reality, because methamphetamine has "hijacked" the dopamine system. It has rewired the circuitry of the brain and changed the neurological dopamine release/reward system. It also causes actual structural changes that can be seen on a brain scan. The brain starts to lose its ability to process dopamine, meaning the person is no longer able to experience normal pleasure. He or she then seeks out the drug, because that is the only way he or she is able to experience the dopamine and its reward system.

> [Fn.26] Yufik gave the example of someone planning a party, which requires planning, organization, and deliberation. The person actually has to think about the components—how much money to budget, how many people to invite, where to hold the event, and the like—in order to execute them. A person with an impairment in the prefrontal cortex, which is the portion of the brain affected by methamphetamine use, will not be able to carry out a complex series of behaviors like that.

Yufik explained that a drug abuser using methamphetamine will experience a clinically significant reduction in dopamine, because the relevant part of the brain has been damaged. In severe cases, that translates into psychotic behavior, with "psychotic" meaning the person loses touch with reality. The person may start to develop paranoid delusions, believing people are trying to hurt or kill him or her without a basis in reality. The person sometimes begins to experience hallucinations, something the person sees, but nobody else does. The person may see ghosts, demons, or angels that are not real. [Fn.27] He or she may also experience auditory hallucinations, i.e., the hearing of voices coming from within the person's own brain. The person cannot distinguish between voices coming from the outside and within the brain, and starts to respond to the internal voices. These are classic symptoms of methamphetamine-induced psychosis. [Fn.28]

> [Fn.27] Yufik defined a hallucination as "a distortion in reality where a person sees things that aren't really there." If a person said there were tigers everywhere and there were, in fact, no tigers present, that could be evidence of a hallucination. Similarly, if a person said, "You set these tigers upon me," and there were, in fact, no tigers set upon that person, that could be evidence of a hallucination.

> [Fn.28] Yufik admitted testifying in an earlier case that when speaking of methamphetamine, it was more common for the person to interpret reality as threatening, as opposed to hallucinating.

Yufik explained there can be other causes of psychosis, such as schizophrenia, the hallmark of which is losing touch with reality. Unlike with schizophrenia, however, once a person with methamphetamine-induced psychosis stops using the drug, the psychotic symptoms disappear over a period of time, the length of which depends

on the individual. In the schizophrenic person, the symptoms remain. Thus, there is a correlation between methamphetamine and methamphetamine-induced psychosis: If a person has no methamphetamine in his or her system, he or she cannot have methamphetamine-induced psychosis.

Yufik testified that sometimes the hallucinations experienced as a result of methamphetamine use result in violence, though not always. According to Yufik, there is a very complex relationship between the amount of methamphetamine a person ingests on a particular occasion and whether that person is going to commit violence. A recent study showed there is no statistical significance between how much is ingested and whether the person has psychotic symptoms. As for correlation between prolonged use of methamphetamine and the development of psychotic symptoms, Yufik explained there is some evidence in the research that suggests prolonged use is more likely to result in development of psychosis, but not necessarily. A person can have prolonged use but not develop psychotic symptoms, because not every brain processes the drugs exactly the same and so there is an issue of individual vulnerability.

Yufik also testified that methamphetamine is correlated with violence. He explained the rate of violence is nine times higher in people who use methamphetamine than in people who use other drugs. He further explained that when a person takes methamphetamine, he or she experiences impulse control problems. Ordinarily, there is a kind of barrier that allows a person to decide whether to delay an impulse. When that barrier is removed, as it is when methamphetamine is used, the person simply acts on impulse, because the control center is impaired.

Yufik performed a forensic evaluation on defendant. He was asked to determine whether defendant had a mental illness or a substance abuse; if so, whether that substance abuse was related to methamphetamine; and, if so, what role methamphetamine played in his behavior and alleged criminal actions. To this end, Yufik reviewed all the materials defense counsel provided, which included police and witness reports, transcripts of the witness reports, the autopsy photographs, crime scene photographs, Dr. Sims's psychological report, the autopsy report, the video recording of defendant's interrogation, and defendant's toxicology report. [Fn.29] Yufik then met with defendant in jail for five and a half hours. During this time, Yufik conducted a clinical interview, which in addition to observing defendant's behavior, involved asking defendant about such things as his background and clinical history. Yufik also conducted forensic testing, which involved administering several psychological tests. His evaluation included consideration of whether defendant was malingering. Yufik then reviewed the relevant literature.

> [Fn.29] Dr. G. Preston Sims, a forensic psychologist, was appointed by the court to evaluate whether defendant met the criteria for legal insanity under California law. For various reasons not pertinent to this appeal, the evaluation was not ordered until 2013.

Based on all the information available to him, Yufik concluded defendant had substance abuse disorder as that diagnosis was given in the Diagnostic and Statistical Manual, fifth edition (DSM–V). The criteria were cravings, withdrawal symptoms, and continuing to use the substance despite negative consequences. He also concluded, to a reasonable degree of psychological certainty, defendant was under the influence at the time of the offense.

Yufik explained "malingering" means the person is deliberately trying to fake

something, usually the existence or absence of a mental illness. There are standardized psychological tests to help determine whether someone is malingering, and Yufik administered two of them—the Personality Assessment Inventory (PAI) and the Miller Forensic Assessment Tool (M–FAST)—to defendant. After administering these tests, Yufik formed the opinion defendant was not malingering during Yufik's psychological evaluation of him. [Fn.30]

> [Fn.30] Because there was no indication defendant was fabricating a memory impairment, Yufik did not administer the test of memory malingering (TOMM). Yufik also did not administer the WASI or MMPI–2 tests, which were not necessarily relevant for methamphetamine-induced psychosis. Yufik explained that the tests for malingering are designed to find a particular pathology of a person. Someone could lie to the evaluator and not necessarily be labeled a malingerer.

According to Yufik, methamphetamine-induced psychosis is a symptom of the mental illness of methamphetamine abuse. To evaluate someone for methamphetamine-induced psychosis, Yufik looked at the totality of the circumstances to see if the person showed symptoms thereof. He also ruled out alternative hypotheses. [Fn.31] In defendant's case, Yufik also had information defendant had a severe personality disorder independent of any methamphetamine psychosis. Impulsiveness, irresponsibility, acting without due consideration of others, disrespecting societal customs, and manipulation were traits of this personality disorder.

> [Fn.31] The fact someone claimed to see dead people did not necessarily mean he or she was suffering from some type of psychosis.

Based on his psychological evaluation, Yufik concluded, to a reasonable degree of psychological certainty, defendant had methamphetamine-induced psychosis during the relevant time period surrounding the killings. To some degree, it was the combination of the substance abuse disorder and the antisocial personality disorder that created the methamphetamine-induced psychosis in defendant's case.

People v. Xiong, 2016 WL 3950717, at *1–15 (Cal. Ct. App. 2016).

## III. DISCUSSION

### A. Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged conviction arises out of the Stanislaus County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

18

1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.    Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-406).

In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Cullen v. Pinholster, 563 U.S. 170, 203 (2011). Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Harrington, 562 U.S. at 103.

The second prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)).

Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997). A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

C.      Review of Petition

The petition presents the following claims for relief: 1) Petitioner did not knowingly withdraw his plea of not guilty by reason of insanity ("NGI"); 2) Defense counsel rendered ineffective assistance in several instances; 3) The trial court failed to conduct further inquiry into Petitioner's state of mind before accepting withdrawal of the NGI plea; 4) Defense counsel rendered ineffective assistance by not allowing Petitioner to plead not guilty by reason of insanity; 5) The prosecutor committed misconduct introducing perjured testimony; and 6) False evidence was used against Petitioner.

1.      Withdrawal of NGI plea

Petitioner first claims the trial court erred when it permitted him to withdraw his plea of not guilty by reason of insanity. Petitioner raised this claim by habeas petition to the state courts.

20

In the last reasoned decision, the Stanislaus County Superior Court denied the claim as follows:

> Petitioner argues the trial court denied him due process by failing to adequately insure that he knowingly and voluntarily withdrew his plea of not guilty by reason of insanity (NGI plea) and then went to trial on a plea of not guilty. To the extent petitioner implies that the trial court's inquiry into his plea was inadequate, this issue could have been raised on appeal and is therefore not cognizable on habeas corpus. (*In re Dixon* (1953) 41 Cal.2d 756, 759 (*Dixon*) ["in the absence of special circumstances constituting an excuse for failure to employ that remedy, the writ will not lie where the claimed errors could have been, but were not, raised upon a timely appeal from a judgment of conviction"].) Petitioner also asserts the trial court improperly relied on an email in which his defense attorney only tentatively announced a desire to have the NGI plea withdrawn; since this email is extrinsic to the record on appeal, the *Dixon* rule does not apply to this portion of petitioner's claim. However, the record does not support his position. Petitioner was personally present at the hearing at which the NGI plea was withdrawn. The trial court asked him, multiple times, if he had had enough time to discuss the change of plea with counsel, and, multiple times, petitioner responded that he had.
>
> While the trial court did refer to the email from defense counsel when it expressed an understanding that petitioner and his counsel had been discussing a change of plea, the court also made a later statement that it wanted to "make sure [petitioner] fe[lt he had] been able to talk to [defense counsel] about [his] change of plea." (Exhibit I to Return p. 304:6-304:8.) The record belies the assertion that the trial court relied on defense counsel's email rather than its own independent questioning of petitioner and his counsel.

(Doc. 21-17 at 2-3.)

### a. Legal Standard and Analysis

Petitioner challenges the state court's application of California law in a change of plea hearing wherein Petitioner withdrew his plea of not guilty by reason of insanity. Generally, the interpretation and application of state laws are not cognizable on federal habeas. Estelle v. McGuire, 502 U.S. 62, 67 (1991) (quoting Lewis v. Jeffers, 497 U.S. 764, 780 (1990)) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'"); Gilmore v. Taylor, 508 U.S. 333, 348-49 (1993) (O'Connor, J., concurring) ("mere error of state law, one that does not rise to the level of a constitutional violation, may not be corrected on federal habeas"); Sawyer v. Smith, 497 U.S. 227, 239 (1990) (quoting Dugger v. Adams, 489 U.S. 401, 409 (1989) ( "[T]he availability of a claim under state law does not of itself establish that a claim was available under the United States Constitution"). To the extent the claim concerns the interpretation and application of state law, it is not cognizable on federal habeas review. Pulley v. Harris, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on the

21

1 basis of a perceived error of state law"). Moreover, federal courts are bound by state court rulings

2 on questions of state law. <u>Oxborrow v. Eikenberry</u>, 877 F.2d 1395, 1399 (9th Cir.1989).

3       As to any claim that the process violated Petitioner's federal constitutional rights, as noted

4 by Respondent, there is no direct precedent from the Supreme Court which holds that a certain

5 type of inquiry is required before a court accepts a defendant's request to withdraw an NGI plea.

6 <u>See</u> <u>Melcher v. Holland</u>, 2014 WL 31359, *20 (N.D. Cal. 2014) (citing <u>Florida v. Nixon</u>, 543

7 U.S. 175, 187 (2004)). "[I]t is not an unreasonable application of clearly established Federal law

8 for a state court to decline to apply a specific legal rule that has not been squarely established by

9 [the Supreme] Court." <u>Knowles</u>, 556 U.S. at 122. Therefore, Petitioner's allegation that the trial

10 court abused its discretion in accepting his request to withdraw his NGI plea does not present a

11 cognizable claim on habeas review.

12       Even if the trial court were constitutionally required to ascertain whether his request was

13 made voluntarily, knowingly, and intelligently, the state court's determination would not be

14 unreasonable. As noted by the state court, the record shows Petitioner was personally present at

15 the hearing at which the NGI plea was withdrawn. (Doc. 20-7 at 3-6.) Petitioner was asked

16 multiple times if he had had enough time to discuss the change of plea with counsel, and, multiple

17 times, petitioner responded that he had. (Doc. 20-7 at 3-6.) Petitioner fails to show that the state

18 court rejection of his claim was unreasonable.

19       2.  <u>Ineffective Assistance of Counsel</u>

20       In his next claim, Petitioner alleges that defense counsel rendered ineffective in the

21 following ways: 1) advising Petitioner to withdraw his NGI plea; 2) failing to obtain a

22 toxicologist for rebuttal; 3) failing to obtain a credible methamphetamine expert; 4) failing to

23 show Petitioner's interrogation video to the jury which would have demonstrated his insanity; and

24 5) failing to fully investigate Dr. Blak's investigative report.

25       *a. Legal Standard*

26       Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth

27 Amendment. <u>Evitts v. Lucey</u>, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of

28 counsel are reviewed according to <u>Strickland's</u> two-pronged test. <u>Strickland v. Washington</u>, 466

22

U.S. 668, 687-88 (1984); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also Penson v. Ohio, 488 U.S. 75(1988) (holding that where a defendant has been actually or constructively denied the assistance of counsel altogether, the Strickland standard does not apply and prejudice is presumed; the implication is that Strickland does apply where counsel is present but ineffective).

To prevail, Petitioner must show two things. First, he must establish that counsel's deficient performance fell below an objective standard of reasonableness under prevailing professional norms. Strickland, 466 U.S. at 687-88. Second, Petitioner must establish that he suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed at trial. Id. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. Id. The relevant inquiry is not what counsel could have done; rather, it is whether the choices made by counsel were reasonable. Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).

With the passage of the AEDPA, habeas relief may only be granted if the state-court decision unreasonably applied this general Strickland standard for ineffective assistance. Knowles v. Mirzayance, 556 U.S. 111, 122 (2009). Accordingly, the question "is not whether a federal court believes the state court's determination under the Strickland standard "was incorrect but whether that determination was unreasonable–a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Knowles, 556 U.S. at 123. In effect, the AEDPA standard is "doubly deferential" because it requires that it be shown not only that the state court determination was erroneous, but also that it was objectively unreasonable. Yarborough v. Gentry, 540 U.S. 1, 5 (2003). Moreover, because the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard. See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.")

*b.   Analysis – Advising Petitioner to Withdraw NGI Plea*

Petitioner complains that defense counsel rendered ineffective assistance by advising him

23

to withdraw his NGI plea.  He claims that an NGI defense would certainly have been successful.

He points to Dr. Blak's report, which concluded that Petitioner was not guilty by reason of

insanity in light of Petitioner's methamphetamine use.  He notes an email where trial counsel

advised state habeas counsel as follows:

> I do not remember [Dr. Blak's] report. If I've seen it, I don't remember. I did look through the court file. The only mention of a Dr. Blak that I can see, is a mention in Mr. Gradford's motion to continue, on or about 6/7/12, that he had made some calls to a Dr. Blak. It's conceivable that I missed that. It's also conceivable that I saw that, and had nothing to compare it to since I didn't have Dr. Blak's report. It's conceivable that Mr. Gradford subsequently sent me Dr. Blak's report, and I missed it in the voluminous discovery. But I think I would have remembered and acted on that report if I had seen it.

(Doc. 21-14 at 73.)

Petitioner raised this claim in habeas petitions to the state courts. In the last reasoned

decision, the superior court denied the claim as follows:

> Petitioner next accuses his trial counsel of rendering ineffective assistance of counsel (IAC) by not pleading NGI even though Dr. Blak's report concluded petitioner had been legally insane at the time of the crimes. As "[IAC] claims are more appropriately addressed in a habeas corpus proceeding" than on direct appeal, which disallows presentation of extrinsic evidence, petitioner's IAC claims are not barred by the *Dixon* rule. (See, e.g., *People v. Ledesma* (2006) 39 Cal.4th 641, 746.) However, the evidence shows that this claim fails for lack of prejudice, at the very least. "[A] defendant must show both deficient performance by counsel and prejudice in order to prove that he has received ineffective assistance of counsel." (*Knowles v. Mirzayance* (2009) 556 U.S. 111, 122.) A trial attorney will not be found to have rendered IAC when the attorney "counseled [the defendant] to abandon a claim that stood almost no chance of success." (*Id*. at p. 123; see also *People v. Henning* (2009) 178 Cal.App.4th 388, 401-402 [no IAC when defense counsel did not pursue NGI plea for defendant who could not be found legally insane because the only basis of alleged insanity was the ingestion of hallucinogenic drugs].)
>
> Here, petitioner complains that his trial counsel, when deciding whether to recommend withdrawing the NGI plea, relied only on the report of Dr. Sims, who found petitioner to be sane, and ignored the report by Dr. Blak, who found the opposite. Dr. Blak's report, however, likely could not have supported an NGI defense because it fails to show that any insanity petitioner may have been undergoing at the time of the crimes occurred as the result of a qualifying mental defect or disease. "In any criminal proceeding in which a plea of not guilty by reason of insanity is entered, this defense shall not be found by the trier of fact solely on the basis of a personality or adjustment disorder, a seizure disorder, or an addiction to, or abuse of, intoxicating substances." (Pen. Code, § 29.8.) Dr. Blak's opinion was that, "at the time of the alleged offenses, [petitioner] suffered a substance abuse induced psychotic break and therefore was legally insane at the time of these offenses." (Exhibit 2 to petition p. 10.) Because Penal Code section 29.8 means that substance abuse alone cannot support a conclusion that petitioner was insane, Dr.

24

Blak's conclusion (i.e. legal insanity) does not follow from his premise (i.e. a substance induced psychotic break). In contrast to Dr. Blak, who did not address Penal Code section 29.8 at all, Dr. Sims acknowledged that petitioner indicated he was seeing demons and/or spirits at the time of the crimes but then ultimately found that petitioner could not qualify as legally insane because these symptoms were drug-induced. Petitioner's denial asserts that he "was not going to rely on [drug-induced psychosis] solely, nor would he have to [as] [t]here existed other factors and evidence for NGI." (Denial p. 12.)

However, petitioner identifies none of these "other factors and evidence," and the court found no such evidence in its review of the record. Petitioner also makes much of the fact that doubts were declared about his competency early in the case. However, the report of Dr. Trompetter, who found petitioner competent to stand trial, supports the report of Dr. Sims, in that Dr. Trompetter recounted that petitioner's hallucinations and delusions ceased after his incarceration and therefore were more likely caused by methamphetamine use than by a mental disease or defect. Dr. Blak and Dr. Trompetter both diagnosed petitioner with depression without psychotic features (and Dr. Blak additionally diagnosed anxiety), but neither explained how petitioner's Axis I diagnosis contributed to the symptoms he exhibited at the time of the crimes. (See, e.g., *People v. McCarrick* (2016) 6 Cal.App.5th 227, 247-248 [considering jury instruction indicating that a defendant could be found insane if a disease or defect caused by drug use combined with an existing mental disease or defect not caused by drug use].) Even if defense counsel erred in not considering Dr. Blak's report, the court cannot find that this omission was "sufficient to undermine confidence in the outcome" of the trial. (*Knowles v. Mirzayance* (2009) 556 U.S. 111, 127.)

(Doc. 21-17 at 3-5.)

The state court found that Petitioner suffered no prejudice as a result of defense counsel's alleged failure to consider Dr. Blak's report in recommending withdrawal of the NGI plea. As set forth above, the state court determined that Dr. Blak's diagnosis of a "substance induced psychotic break" did not support an NGI plea under California law. The state court determination of state law is binding on the federal court. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.")

In addition, Petitioner fails to show that the state court rejection of his claim was unreasonable. Dr. Blak concluded that Petitioner suffered a "*substance abuse induced* psychotic break." (emphasis added.) Under California Penal Code § 29.8, substance abuse alone cannot support an NGI plea, and there is nothing in the record apart from substance abuse that would support an NGI plea. Thus, Petitioner cannot demonstrate prejudice. In addition, as Respondent correctly argues, "the failure to take a futile action can never be deficient performance." Rupe v.

Wood, 93 F.3d 1434, 1445 (9th Cir. 1996). Therefore, Petitioner cannot show that counsel was

ineffective.  The claim should be denied.

### c.  Analysis – Failure to Call a Rebuttal Toxicologist

Petitioner next alleges that defense counsel failed to call a rebuttal toxicologist to

challenge the prosecution's expert who had provided false testimony about the level of

methamphetamine in Petitioner's blood. Petitioner also raised this claim on collateral review to

the state courts. In the last reasoned decision, the Stanislaus County Superior Court rejected the

claim as follows:

> Petitioner's fourth ground for relief asserts that trial counsel rendered IAC by
> declining to retain a defense expert toxicologist. This claim largely rests on a
> premise that runs throughout the petition, namely, that the People presented false
> evidence in the form of testimony from their toxicologist, Mr. Coleman. At trial,
> Mr. Coleman testified that the upper range of the therapeutic level of
> methamphetamine detected in the blood is 50 nanograms per milliliter, and the
> bottom of the toxic range was 600 nanograms per milliliter. After testifying that
> petitioner's blood tested at 150 nanograms of methamphetamine per milliliter, Mr.
> Coleman was then asked: "In fact, isn't [petitioner's blood concentration for
> methamphetamine] much closer to the normal level than any toxic level?" (Exhibit
> N. to Return p. 487; 16-487:17.) The witness's response was: "The therapeutic level,
> yes." (Exhibit N to Return p. 487:18.) From this testimony, petitioner infers Mr.
> Coleman told the jury that petitioner's meth level was in the therapeutic range when
> this was untrue. All Mr. Coleman said, however, was that petitioner's level of 150
> nanograms per milliliter was closer to the "therapeutic range," which ends at 50,
> than to the "toxic" range, which begins at 600. Because it is incontrovertible that
> 150 is closer to 50 than it is to 600, the court finds there was no "false" testimony,
> and it also rejects the implication that Mr.  Coleman affirmatively testified that
> petitioner was *in* the "therapeutic" range when what he said was that petitioner was
> *closer* to the therapeutic range *than* the toxic range. In fact, in later questioning of
> Mr. Coleman, the prosecutor himself clarified that petitioner's results were above,
> not in, the therapeutic range. (Exhibit N to return p. 488:23-488:26.)
>
> What petitioner contends, then, is that his trial counsel failed to adequately rebut the
> People's expert toxicologist, generally. However, a "'fair assessment of attorney
> performance requires that every effort be made to eliminate the distorting effects of
> hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to
> evaluate the conduct from counsel's perspective at the time. Because of the
> difficulties inherent in making the evaluation, a court must indulge a strong
> presumption that counsel's conduct falls within the wide range of reasonable
> professional assistance; that is, the defendant must overcome the presumption that,
> under the circumstances, the challenged action "might be considered sound trial
> strategy."'" (*In re Valdez* (2010) 49 Cal.4th 715, 729-730.) In addition, "[t]actical
> errors are generally not deemed reversible." (*People v. Hart* (1999) 20 Cal.4th 546,
> 623.) Here, petitioner's trial attorney explained that he did not hire a defense expert
> in toxicology because in his view it usually worked better with the jury to poke holes
> in the prosecution's expert's theories than to appear to have retained a "hired gun."
> (Exhibit C to Petition p. 17.) This is the type of tactical decision to which this court
> must defer. Moreover, at trial defense counsel asked Mr. Coleman numerous

questions about methamphetamine metabolism, all of which were designed to show that petitioner's methamphetamine concentration would have been much higher when the crimes were committed than five hours later, when his blood was drawn. He also hired Alex Yufik, who testified extensively about the effects of methamphetamine on behavior. In other words, counsel gave the jury a reason to think that 150 nanograms per milliliter was not a valid figure for what petitioner's methamphetamine concentration was when the crimes occurred, which would also give the jury a reason to question any of the conclusions Mr. Coleman drew based on this number as well as a reason to think that petitioner's capacity was so diminished that he did not have the intent needed to prove murder against him. It appears petitioner thinks it would have been better for his counsel to have instead focused on how significantly the methamphetamine he had consumed would have been affecting him when the crimes occurred, because that would best show the jury that he lacked the mens rea to commit murder. Either approach calls into doubt the People's theory that petitioner's methamphetamine concentration was not very high at the time of the crimes. This court will again not second-guess counsel's tactical decision about which path to take to call proof of mens rea into doubt.

(Doc. 21-17 at 5-7.)

In rejecting the claim, the state court applied the correct legal standard; therefore, the only question for this Court is whether that application was objectively unreasonable. The Court finds that it was not.

As noted above, Petitioner fails to show that counsel's performance was deficient or that Petitioner suffered any prejudice. First, Petitioner's argument that the prosecution presented false evidence is wrong. As noted by the state court, the expert did not testify that Petitioner's methamphetamine level in his blood was in the therapeutic range. He testified that the upper range of the therapeutic range was 50 nanograms per milliliter, and the lower range of the toxic range was 600 nanograms per milliliter. He testified that Petitioner's level of 150 nanograms per milliliter was closer to the therapeutic range. Clearly, this was an accurate statement. Thus, even if defense counsel had retained an expert, there was no false evidence to rebut.

Second, the state court pointed out that defense counsel opted not to call his own expert witness, because he found it worked better with a jury to poke holes in the expert witness's theories rather than use a "hired gun." Defense counsel was able to take the expert's testimony and argue that Petitioner's methamphetamine level would have been much higher at the time of the crime than five hours later when the blood was drawn. Defense counsel also called another expert to testify to the effects of methamphetamine on behavior. Counsel then mounted an attack on the *mens rea* element of the crime, arguing that Petitioner's methamphetamine level was much

higher at the time of the crime, and therefore, he lacked the *mens rea* to commit murder.

Petitioner fails to show that counsel's tactical decision was unsound. Clearly, he does not show

that the state court's decision rejecting his claim was unreasonable.

### d. Analysis – Failure to Retain Credible Methamphetamine Expert

In his next claim of ineffective assistance of counsel, Petitioner alleges that defense

counsel failed to obtain a credible methamphetamine expert because the expert that defense

counsel had called, Dr. Yufik, was impeached at trial. He further alleges that defense counsel

failed to ask Dr. Yufik hypotheticals about whether Petitioner was "legally insane." In the last

reasoned decision, the Stanislaus County Superior Court rejected the claim as follows:

> Petitioner's seventh ground for relief asserts trial counsel provided IAC by hiring
> Dr. Yufik because the doctor's credibility was completely impeached after it came
> out that Dr. Yufik had told Dr. Sims, one of the People's experts, that he (Dr. Yufik)
> was not an expert in methamphetamine. At trial, Dr. Yufik clarified that he is an
> expert in methamphetamine abuse, but not necessarily research on the same topic,
> because he is a practical scientist rather than a researcher. This court questions how
> trial counsel was supposed to know that Dr. Yufik was going to make this comment
> to Dr. Sims at the time of hire and notes that counsel had Dr. Yufik explain the
> meaning of his comments multiple times.
>
> Petitioner also argues counsel rendered IAC by failing to ask hypotheticals designed
> to demonstrate that he was behaving in ways indicative of insanity at the time of the
> crimes, thereby showing he was legally insane. As this court has already explained,
> however, Penal Code section 29.8 makes an NGI defense unavailable to petitioner
> because he only alleges drug-induced insanity. The IAC claim therefore fails for
> lack of prejudice. Any claim that counsel was obligated to use hypotheticals to
> emphasize petitioner's more bizarre behaviors (masturbating in the interrogation
> room, yelling about demons and tigers, standing in the street in his boxer shorts
> while armed, etc.) at the time of the offenses misses the delicate balance it was to
> give the jury enough information from which it could conclude that petitioner lacked
> mens rea without also providing reasons to be prejudiced against petitioner. Counsel
> used hypotheticals to cast doubt on petitioner's methamphetamine test results but
> declined to use them regarding the more extreme details of petitioner's behavior.
> His choice in this regard is another tactical decision to which this court will defer.

(Doc. 21-17 at 7-8.)

The state court rejection of the claim was not unreasonable. Defense counsel stated that

Dr. Yufik had good credentials and meth psychosis experts are difficult to find. (Doc. 21-14 at

74.) There was no way defense counsel could have known that Dr. Yufik would be impeached in

such a way at trial. Defense counsel cannot be faulted for failing to predict this would occur.

With respect to Petitioner's allegation that defense counsel should have given Dr. Yufik

28

hypotheticals concerning his bizarre behaviors, the state court reasonably determined that

Petitioner did not suffer any prejudice.  As previously discussed, under Cal. Penal Code § 29.8,

the NGI defense was unavailable to Petitioner because he only alleged drug-induced insanity.

Therefore, any hypothetical attempting to show "legal insanity" based on Petitioner's drug-

induced behavior would have been futile.  Further, the state court reasonably determined that

defense counsel's tactical decision to cast doubt on the methamphetamine results without

emphasizing Petitioner's more bizarre behaviors merited deference. See Strickland, 466 U.S. at

689 (counsel is afforded "wide latitude . . . in making tactical decisions").

### e. Analysis – Failure to Play Interrogation Video

In his final claim of ineffective assistance of counsel, Petitioner alleges defense counsel

was ineffective by failing to play the video for the jury of his interrogation on the night of the

murder.  The Stanislaus County Superior Court rejected this claim as follows:

> Petitioner next accuses his trial attorney of rendering IAC for not showing the jury
> the interrogation video, in which petitioner was apparently masturbating, because,
> if the jury had seen the video, it would have concluded he was insane. Again,
> however, insanity would not have been a helpful defense. Also, and as discussed in
> the preceding paragraph, the extent to which trial counsel showed the jury how
> erratic petitioner's behavior was during interrogation is the sort of tactical decision
> that is generally not deemed reversible.

(Doc. 21-17 at 8-9.)

As previously discussed, the state court determined that the insanity defense was not

legally available under Cal. Penal Code § 29.8.  Therefore, showing the video would not have

aided the defense for that purpose.  In addition, defense counsel believed Petitioner's best defense

centered on meth psychosis and Hmong cultural beliefs. A video of Petitioner masturbating

during an interrogation would not have furthered that defense, and in fact, could have been

detrimental. Counsel's tactical decision not to play the video was not unreasonable. See

Strickland, 466 U.S. at 689 (counsel is afforded "wide latitude . . . in making tactical decisions").

The claim should be denied.

### 3. Trial Court Failure to Conduct Adequate Inquiry

Petitioner claims that the trial court failed to conduct an adequate inquiry on his mental

competency before accepting his withdrawal of the NGI plea.  The claim was raised before the

state courts on habeas review, and the Stanislaus County Superior Court rejected the claim as follows:

> In his second ground for relief, petitioner contends that, because at least one expert had raised doubts about petitioner's sanity, the trial court was obligated to question him at greater length before allowing the withdrawal of the NGI plea. Because this argument rests entirely on matters included in the record on appeal, petitioner may not raise this contention on habeas corpus, instead. (*Dixon, supra*, 41 Cal.2d at p. 759.)

(Doc. 21-17 at 3.)

Respondent alleges the claim is procedurally defaulted and meritless. Petitioner disagrees.

### a. Procedural Default

State courts may decline to review a claim based on a procedural default. Wainwright v. Sykes, 433 U.S. 72, 86–87 (1977). In turn, federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." Coleman v. Thompson, 501 U.S. 722, 729 (1991); LaCrosse v. Kernan, 244 F.3d 702, 704 (9th Cir. 2001); see Ylst v. Nunnemaker, 501 U.S. 797, 801 (1991); Park v. California, 202 F.3d 1146, 1150 (2000) ("A district court properly refuses to reach the merits of a habeas petition if the petitioner has defaulted on the particular state's procedural requirements . . . ."). This concept has been commonly referred to as the procedural default doctrine. This doctrine of procedural default is based on concerns of comity and federalism. Coleman, 501 U.S. at 730-32. If the court finds an independent and adequate state procedural ground, "federal habeas review is barred unless the prisoner can demonstrate cause for the procedural default and actual prejudice, or demonstrate that the failure to consider the claims will result in a fundamental miscarriage of justice." Noltie v. Peterson, 9 F.3d 802, 804-805 (9th Cir. 1993); Coleman, 501 U.S. at 750; Park, 202 F.3d at 1150.

The mere occurrence, however, of a procedural default will not necessarily bar a federal court from reviewing claims in a petition for writ of habeas corpus. In order for the procedural default doctrine to apply and thereby bar federal review, the state court determination of default must be grounded in state law that is both adequate to support the judgment and independent of

federal law.  Ylst, 501 U.S. at 801; Coleman, 501 U.S. at 729-30.  Put another way, the procedural default doctrine will apply only if the application of the state procedural rule provides "an adequate and independent state law basis" on which the state court can deny relief.  Park, 202 F.3d at 1151 (quoting Coleman, 501 U.S. at 729-30).

In re Dixon refers to California's procedural rule which provides that a California court, in a habeas corpus proceeding, will not review the merits of a claim if that claim could have been raised in a timely appeal but was not.  In re Dixon, 41 Cal.2d at 759 ("[I]n the absence of special circumstances constituting an excuse for failure to employ [the] remedy [of direct review], the writ will not lie where the claimed errors could have been, but were not, raised upon a timely appeal from a judgment of conviction").  See In re Harris, 5 Cal.4th 813, 823 (1993) (explaining Dixon rule).  Since the California Supreme Court's 1998 decision in In re Robbins, 18 Cal.4th 770, 811-812 & n. 32 (1998), the Dixon rule has been independent of federal law.  Park, 202 F.3d at 1152.  Since the California Supreme Court's 1993 decisions in In re Harris, 5 Cal.4th 813, 823 (1993) and In re Clark, 5 Cal.4th 750 (1993), the Dixon rule has been consistently applied, i.e., "adequate."  Park, 202 F.3d at 1152.  Hence, any state court ruling procedurally barring a habeas claim because the petition failed to raise that claim in his direct appeal, i.e., the Dixon rule, will be barred on federal habeas review unless the petitioner can demonstrate (1) cause for the default and actual prejudice resulting from the alleged violation of federal law, or (2) a fundamental miscarriage of justice.  Harris v. Reed, 489 U.S. 255, 262-263 (1989); Coleman, 501 U.S. at 750.

In this case, the state court imposed the Dixon procedural bar.  At the time the bar was imposed, the rule was both adequate and independent of federal law.  Petitioner fails to establish cause and prejudice, or that a fundamental miscarriage of justice occurred.  Therefore, the claim is procedurally defaulted and should be denied.  As discussed below, the claim is also meritless.

*b.  Analysis*

A defendant may not be criminally prosecuted while he is incompetent, and "he may not . . . plead guilty unless he does so 'competently and intelligently.'"  Godinez v. Moran, 509 U.S. 389, 396 (1993) (quoting Johnson v. Zerbst, 304. U.S. 458, 468 (1939)); Medina v. California, 505 U.S. 437, 449 (1992); Drope v. Missouri, 420 U.S. 162, 172-73 (1975); Pate v. Robinson,

383 U.S. 375, 386 (1966).  Before the plea can be accepted, the court must be satisfied that the plea is "intelligent and voluntary."  Godinez, 509 U.S. at 400.  His mental condition must be such that he has "the capacity to understand the nature and object of the proceedings against him."  Dusky v. United States, 362 U.S. 402 (1960).

However, the Supreme Court noted that "a court is [not] required to make a competency determination in every case in which a defendant seeks to plead guilty or to waive his right to counsel.  As in any criminal case, a competency determination is necessary only when a court has reason to doubt the defendant's competence."  Godinez, 509 U.S. at 417; Drope, 420 U.S. at 180-181; Pate, 383 U.S. at 385.  "[E]vidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required," and "one of these factors standing alone may, in some circumstances, be sufficient."  Drope, 420 U.S. at 180 (paraphrasing Pate, 383 U.S. at 385).  In reviewing whether a trial judge should have *sua sponte* conducted a competency hearing, the Court must consider only the evidence that was before the trial judge.  Williams v. Woodford, 384 F.3d 567, 604 (9th Cir. 2004).

In this case, Dr. Philip S. Trompetter examined Petitioner pursuant to Cal. Penal Code § 1368 and determined he was competent to stand trial. (Doc. 20-1 at 289.)  On September 7, 2011, the trial court found Petitioner competent based on Dr. Trompetter's report. (Doc. 20-1 at 297.)  As noted by Respondent, there were no indications that Petitioner was not competent to stand trial. At the change of plea hearing on December 12, 2013, there was no evidence of any irrational behavior, demeanor, or incompetence by Petitioner.  The record shows that Petitioner was lucid, oriented, and provided precise answers to all of the court's questions. (Doc. 20-7 at 3-6.)  Thus, it was reasonable for the trial court to forego any further inquiry into Petitioner's competence, and the change of plea hearing satisfied due process.

Petitioner fails to demonstrate that the state court rejection of his claim was contrary to or an unreasonable application of Supreme Court authority.  The claim is also procedurally defaulted.  Accordingly, the claim should be denied.

4. <u>Trial Counsel's Decision to Allow Petitioner to Withdraw his NGI Plea</u>

Next, Petitioner claims that defense counsel violated his constitutional rights by misleading him into withdrawing his NGI plea. Citing to <u>McCoy v. Louisiana</u>, 138 S.Ct. 1500 (2018), Petitioner claims that defense counsel usurped his autonomy to decide how to plead. This claim was never presented to the California Supreme Court. Therefore, it is unexhausted. <u>See</u> 28 U.S.C. § 2254(b)(1)(A). Nevertheless, the claim is meritless on its face, and so the Court will recommend it be denied. <u>See</u> 28 U.S.C. § 2254(b)(2) (claim may be denied on the merits notwithstanding the failure to exhaust state remedies).

In <u>McCoy</u>, the defendant maintained his innocence and insisted he did not commit the charged offenses. <u>McCoy</u>, 138 S.Ct. at 1505. However, at the guilt phase of trial, defense counsel overrode Petitioner's decision to plead innocence and admitted defendant's guilt to the jury. <u>Id</u>. Defense counsel believed that confessing guilt would have the best chance to avoid the death penalty. <u>Id</u>. The Supreme Court determined that Petitioner's Sixth Amendment constitutional rights were violated, because the decision whether to plead innocence or admit guilt was the defendant's decision alone. <u>Id</u>.; <u>see</u> <u>Weaver v. Massachusetts</u>, 582 U.S. __, __, 137 S.Ct. 1899, 1908 (2017) (it is a "fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty".)

In this case, however, defense counsel did not withdraw Petitioner's NGI plea over Petitioner's objection. Rather, Petitioner personally withdrew his NGI plea in open court. (Doc. 20-7 at 3-6.) Thus, <u>McCoy</u> is not availing. Further, there is no indication that Petitioner was forced to withdraw his plea, or that his open court decision was anything but voluntary. Therefore, Petitioner's constitutional rights were not violated. The claim should be denied.

5. <u>Prosecutorial Misconduct – Introduction of Perjured Testimony</u>

Petitioner claims that the prosecutor committed misconduct by allowing an expert witness to testify that the concentration of methamphetamine in Petitioner's blood was in the therapeutic range. This claim was presented in Petitioner's habeas petitions to the state courts. In the last reasoned decision, the Stanislaus Superior Court rejected the claim as follows:

In the fifth ground he asserts, petitioner argues the People "engaged in misconduct

by allowing [Mr. Coleman] to testify that Petitioner was in the therapeutic range." (Petition pp. 44-45.) As this order has already explained, no testimony that petitioner was *in* the therapeutic range occurred. The denial asserts the prosecution team had both reason to know Mr. Coleman's testimony was suspect and a duty to correct his misstatements. However, petitioner cites no portion of the record showing this to be true, and the court has independently located no such evidence. Moreover, petitioner's claim that the prosecutor committed misconduct by not contradicting Mr. Coleman at trial is based on the facts that "[t]he criminalist who worked with the prosecutor had a written conclusion different from Coleman" and that "the prosecutor was aware that the lead investigator waited five hours before drawing Petitioner's blood." (Denial p. 20.) Petitioner was obligated to raise these issues on appeal, as their resolution depends on matters known prior to judgment. (*Dixon, supra*, 41 Cal.2d 756, 759 (*Dixon*).)

(Doc. 21-17 at 7.)

### a. Legal Standard

A petitioner is entitled to habeas corpus relief if the prosecutor's misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). To constitute a due process violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." Greer v. Miller, 485 U.S. 756, 765 (1987) (quoting United States v. Bagley, 473 U.S. 667 (1985)). Any claim of prosecutorial misconduct must be reviewed within the context of the entire trial. Id. at 765-66; United States v. Weitzenhoff, 35 F.3d 1275, 1291 (9th Cir. 1994). The Court must keep in mind that "[t]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor" and "the aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused." Smith v. Phillips, 455 U.S. 209, 219 (1982). If prosecutorial misconduct is established, and it was constitutional error, the error must be evaluated pursuant to the harmless error test set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993). See Thompson, 74 F.3d at 1577 (Only if constitutional error is established "would we have to decide whether the constitutional error was harmless.").

"[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103 (1976); Napue v. Illinois, 360 U.S. 264 (1959). So must a conviction obtained by the presentation of false

evidence.  <u>See</u> <u>United States v. Bagley</u>, 473 U.S. 667, 678-80 nn.8-9 (1985).  In <u>Napue</u>, the Supreme Court held that the knowing use of false testimony to obtain a conviction violates due process regardless of whether the prosecutor solicited the false testimony or merely allowed it to go uncorrected when it appeared.  <u>Id</u>. at 269.  The Court explained that the principle that a State may not knowingly use false testimony to obtain a conviction - even false testimony that goes only to the credibility of the witness - is "implicit in any concept of ordered liberty."  <u>Id</u>.  In order to prevail on such a due process claim, "the petitioner must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material."  <u>United States v. Zuno–Arce</u>, 339 F.3d 886, 889 (9th Cir. 2003), *cert. denied*, 540 U.S. 1208 (2004).  Nevertheless, simple inconsistencies in testimony are insufficient to establish that a prosecutor knowingly permitted the admission of false testimony.  <u>United States v. Zuno-Arce</u>, 44 F.3d 1420, 1423 (9th Cir.1995).  "Discrepancies in . . . testimony . . . could as easily flow from errors in recollection as from lies."  <u>Id</u>.

### b. *Analysis*

As pointed out by Respondent, the claim rests on a faulty premise.  The expert witness testified that the concentration of methamphetamine was *closer* to the therapeutic range, not *in* the therapeutic range.  This was an accurate factual statement.  Therefore, Petitioner fails to show that the state court rejection of his claim was unreasonable, and the claim should be rejected.

### 6. <u>False Evidence</u>

In his final claim for relief, Petitioner alleges that the expert witness' testimony was false.  Petitioner also raised this claim on state habeas review. In the last reasoned decision, the superior court rejected the claim as follows:

> Next, petitioner again repeats that Mr. Coleman's testimony was "false." (Petition at pp. 45-47.) As this order has already explained, Mr. Coleman did not testify that petitioner's methamphetamine concentration was in the therapeutic range. This court finds no falsity.

(Doc. 21-17 at 7.)

This claim is meritless for the same reasons previously stated.  Petitioner fails to show that

the expert's testimony was false.  Therefore, he fails to show that the state court's rejection of his claim was unreasonable.

**IV.     RECOMMENDATION**

Accordingly, the Court RECOMMENDS that the Petition for Writ of Habeas Corpus be DENIED with prejudice on the merits.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the Objections shall be served and filed within ten court days (plus three days if served by mail) after service of the Objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **November 21, 2019**                    /s/ *Sheila K. Oberto*
                                                  UNITED STATES MAGISTRATE JUDGE